UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

ROBERT L. RINKE, individually,                    CASE NO.
and on behalf of all others simlarly
situated                                          JUDGE

        Plaintiffs,

                            MAGISTRATE JUDGE

      vs.

BP, P.L.C.,
BP PRODUCTS NORTH AMERICA, INC.,
BP CORPORATION OF NORTH AMERICA, INC.,
BP COMPANY NORTH AMERICA, INC.
BP EXPLORATION AND PRODUCTION, INC.
BP AMERICA, INC., ANTHONY HAYWARD,
and JOHN and JANE DOES, 1-100

        Defendants.

CLASS ACTION COMPLAINT

1

## Jury Trial Demanded

1.  COMES NOW, Plaintiff ROBERT L. RINKE, on his own behalf and on behalf of
all others similarly situated ("Plaintiffs"), by and through their undersigned counsel, and
file this action against Defendants BP P.L.C, BP PRODUCTS NORTH AMERICA,
INC., BP CORPORATION OF NORTH AMERICA, INC., BP COMPANY NORTH
AMERICA, INC., BP EXPLORATION AND PRODUCTION, INC., BP AMERICA,
INC., ANTHONY HAYWARD, ("BP" or "BP Defendants), and John Does 1-100 (all
defendants collectively referred to as "Defendants" or "BP and its Defendant
coconspirators"), and allege as follows:

2.  This is a class action lawsuit filed pursuant to Rule 23 of the Federal Rules of
Civil Procedure, to recover damages to Plaintiffs and all others similarly situated.
Plaintiffs' damages were caused by Defendants' scheme to secure billions of dollars in
profits by committing a pattern of criminal predicate acts including mail and wire fraud
through submissions in the permitting process for offshore drilling.

3.  The action is brought under the federal civil RICO statute, 18 U.S.C. § 1964 and
the Florida Civil Remedies for Criminal Practices Act, FLA. STAT. ANN. § 772.104
(commonly referred to as "Florida Civil RICO" or "Florida RICO"). The enormous
economic injury to the Plaintiffs was directly caused by these RICO violations that
resulted in one of the largest environmental and economic catastrophes in history.

4.  Plaintiffs seek treble monetary damages under the federal and Florida RICO
statutes, as well as temporary, preliminary and permanent injunctive relief under the
Florida RICO statute to which they are entitled.

5.  Plaintiffs reserve the right to amend this Complaint with any appropriate

additional claims. There are many currently unknown potential impacts from the oil spill that could cause Plaintiffs further cognizable injuries and damages; plaintiffs reserve the right to amend this Complaint once additional information becomes available.

## I. **INTRODUCTION**

6.      The Gulf of Mexico is in the midst of an ecological Armageddon that could literally destroy the marine and coastal environment and way of life for generations of Americans. On April 20, 2010, an explosion caused the sinking of the mobile offshore drilling unit Deepwater Horizon (hereinafter "Deepwater Horizon" or "Oil Rig"); oil is currently gushing at an estimated rate of 20,000 and 40,000 barrels per day.

7.      The enormous uncontrolled spill has created a fast moving oil slick that, as of May 26, 2010 had covered 29,000 square miles of ocean and has now made landfall on the coasts of Louisiana, Mississippi, Alabama and Florida. Additionally, there are undersea oil plumes spanning miles in length and ranging from 600 to 3,300 feet in depth that have further endangered the Gulf's ecosystem.

8.      Florida's 1,350 miles of coastline is home to 12,000,000 coastal residents, which constitutes 75% of Florida's population. The coastal counties of Florida create 78% of the State's economic output, 77% of the State's jobs and 79% of the State's income. In addition to full time residents, Florida's beaches and coastal areas serve as the backbone of the States $65.5 billion tourism industry. According to *Bloomberg Businessweek*, the damage caused by BP could cost coastal property owners $43 billion in real estate values.

9.      The uncontrolled and uncontained oil spill is a catastrophe of epic proportions brought about by the greed and fraudulent conduct of BP, a multi-billion dollar oil company. The damaged marine, coastal and estuarine environment from the oil spill has

3

directly injured the values of Plaintiffs' coastal properties.

## II. PARTIES

### A. Plaintiffs

10.    Plaintiff, ROBERT L. RINKE owns and resides at the property located at 18 Via De Luna Drive, Beach Club Penthouse #6, Pensacola Beach, FL 32561. The Beach Club Resort and Spa is a 130 unit condominium complex located on the Gulf of Mexico, Pensacola Beach, Escambia County, Florida.

### B. Corporate Defendants

11.    Defendant, BP, P.L.C. ("BP") is a British corporation, organized under the laws of the United Kingdom, doing business in the State of Florida and throughout the United States. BP is one of the world's largest oil companies.

12.    Defendant, BP AMERICA, INC. ("BP America") is a Delaware corporation with its principal place of business in Warrenville, Illinois, but doing business in the State of Florida and throughout the United States. BP America, Inc. is a subsidiary of BP, PLC.

13.    Defendant, BP PRODUCTS NORTH AMERICA, INC. ("BP Products") is a Maryland corporation, with its principal place of business in Houston, Texas, but doing business in the State of Florida and throughout the United States. BP Products North America, Inc. is a subsidiary of BP Company North America, Inc.

14.    Defendant BP CORPORATION OF NORTH AMERICA, INC. (formerly BP Amoco Corporation), is an Indiana corporation with its principal place of business in Houston, Texas, but doing business in the State of Florida and throughout the United States.

15.    Defendant BP COMPANY NORTH AMERICA, INC. is a Delaware corporation

with its principal place of business in Warrenville, Illinois but doing business in the State of Florida and throughout the United States.

16.     Defendant BP EXPLORATION & PRODUCTION, INC. is a Delaware corporation with its principal place of business in Houston, Texas but doing business in the State of Florida.

17.     Defendant, BP, P.L.C. ("BP") is a foreign corporation doing business in the State of Florida.

18.     Defendant BP America, Inc.; BP Corporation North America, Inc.; BP Company of North America, Inc., BP Products North America, Inc., BP P.L.C., and BP Exploration & Production, Inc. are wholly owned subsidiaries of the global parent corporation, BP, PLC, and they shall be referred to herein collectively as "BP."

## C. Individual Defendants

19.     Defendant Anthony Hayward, 1 St. James Place, London, AW1Y4PD, United Kingdom. Defendant Hayward is the Chief Executive Officer ("CEO") and a member of the Board of Directors of BP. ("Defendant Hayward" and collectively referred to along with the BP Corporate Defendants as "BP"). He has served as BP's CEO since 2007 and as an Executive Director since 2003. Before becoming CEO, Hayward, who joined BP in 1982, served as the CEO of Exploration and Production from 2002 to 2007. In exchange for his loyalty and fidelity to BP, Hayward received a salary, performance bonus, non-cash benefits and other emoluments in the amounts of 2,509,000 pounds in 2008 and 3,158,000 pounds in 2009.

## D. John and Jane Doe Defendants

20.     The named Defendants have been assisted by numerous but currently unknown

persons in their unlawful conduct; these persons include, but are not limited to, other corporate and/or individual co-conspirators, including various directors, officers or agents of the named Defendants, along with their respective corporate entities. These unknown persons may be joined to this litigation as named parties when the Plaintiffs know their identities. The identities of these unknown defendants will be revealed in discovery and are referenced herein as John Does 1-100.

## III. JURISDICTION AND VENUE

21.      Jurisdiction in this action is predicated upon Title 18, United States Code, Section 1964 and Title 28, United States Code, Sections 1331 and 1332. There is complete diversity between Defendants and Plaintiffs. The amount in controversy exceeds $75,000. This Court has jurisdiction of the pendent Florida state RICO claims pursuant to United Mine Workers v. Gibbs, 383 U.S. 715 (1966) and 28 U.S.C. § 1367(a), because those claims are so related to the claims arising under the laws of the United States that they form part of the same case or controversy.

22.      Venue for this action is proper under Title 18, United States Code, Section 1965 and Title 28, United States Code, Section 1391(b) (2) and (3), because a substantial part of the events giving rise to this action occurred in this District and because some of the Defendants reside, are found or transacted their affairs in this District and the ends of justice require that the other Defendants be brought before this Court. Plaintiff invokes the expanded service of process provisions of Title 18, United States Code, Section 1965(b).

## IV.  FACTUAL ALLEGATIONS

### A.  A Background of Corruption

23.     British Petroleum is an enormous presence in the oil and gas industry and is the

fourth largest corporation in the world operating in thirty countries. In 2009, BP

produced 2.53 million barrels of oil per day and 8.48 million cubic feet of natural gas per

day. This translates into an astonishing $246 billion in annual revenues, almost one

quarter of a trillion dollars. Behind this robust financial portrait is a corporate culture

fueled by greed, fraud, dishonesty and a disregard of numerous laws and regulations.

24.     In the past five years, BP has admitted to breaking United States environmental

and safety laws as well as committing fraud. Following a 2005 explosion at its Texas

City Refinery, the corporation pled guilty to criminal charges and paid $50 million in

fines. It was then placed on three years probation following the blast while the

Occupational Health and Safety Administration (OSHA) conducted its investigation.

Despite the tragic loss of 15 workers, the resulting criminal charges, and millions of

dollars in fines, BP still failed to correct safety problems at the re-built Texas City

refinery. In October 2009, this resulted in an additional $87 million fine, the largest fine

in OSHA history.

25.     BP oil refineries in Texas and Ohio have accounted for 97% of the "egregious,

willful" violations handed out by OSHA in the last three years. The agency's statistics

reveal that BP received 760 "egregious" and "willful" safety violations; other oil

companies' records pale in comparison. For example, Sunoco and Conoco-Phillips had

eight each, Citgo had two, and Exxon had a single comparable citation.

26.     In 2007, BP again faced criminal fines when 200,000 gallons of crude oil was

released into the Alaskan wilderness from a BP pipeline. Criminal investigators

determined that the company was aware of corrosion along the pipeline where the leak

occurred, but refused to take appropriate action to address it. BP was forced to pay $12
million in criminal fines for the spill in addition to another $4 million to the state of
Alaska.

27.     In 2008, BP, CEO Hayward and other BP executives were named as defendants in
a civil RICO lawsuit involving fraud and a conspiracy to bribe top officials of the
government of Kazakhstan in order to gain oil and gas licenses in the former Soviet state.
This case is currently pending. A similar case was also filed against BP and former CEO
Lord Browne alleging bribery of government officials in Grenada.

28.     On May 5, 2010, a BP shareholder's derivative lawsuit was filed in federal court
in New Orleans based on the central acknowledgment that:

> BP Defendants elected to cut costs, including safety and
> maintenance expenditures, in pursuit of profitable results to
> report to Wall Street. These Defendants also lobbied the
> federal and state government authorities to remove or
> decrease the extent of safety and maintenance regulation of
> the Company's Gulf operations, claiming, against all
> evidence, that 'voluntary compliance' would suffice to
> address safety and environmental concerns. Even after a
> 2006 shareholder derivative proceeding brought as a last
> resort to require BP to address safety concerns was
> voluntarily settled out-of-court by the BP Defendants, these
> defendants continued to ignore and disregard safety issues
> concerning the Company's deepwater operations, making
> purely cosmetic changes at the corporate level while
> ignoring the substance of the safety violations and the
> threat they posed to the entirety of the Gulf, commercial
> and private property, and the Company's own survival as a
> going concern.

**B.     BP'S Scheme To Defraud The Public and The Plaintiffs Of
        Safeguards For Preventing An Adverse Environmental and
        Economic Impact From Oil Spills**

29.     The Minerals Management Service (hereinafter MMS) was created as part of the
Department of Interior in 1982, in conjunction with the Federal Oil and Gas Royalty

8

Management Act. This Act provides for protection of the environment and conservation of federal lands in the course of building oil and gas facilities. The MMS was designated as the agency responsible for the mineral leasing of submerged lands of the Outer Continental Shelf, including the supervision of leaseholder's operations. Over the years, however, what began as a policing unit has turned into an association of oil industry yes-men.

30.     In or around 2000, Vice President Dick Cheney conducted closed-door meetings regarding the "Cheney Energy Task Force" that was to produce a National Energy Policy Report. According to the Report itself, the task force that created the report was made up only of government officials. Records of the Secret Service, however, revealed that participants included oil executives, including Bob Malone, BP's regional president. To date, all parties to the oil industry's closed-door meetings have refused to release any records of the matters discussed or actions taken.

31.     Upon information and belief, part of BP's agenda at the meetings included installing oil industry appointments to MMS and other agencies so that BP could fraudulently cut corners on safeguards for offshore drilling projects.

32.     BP submitted its original Oil Spill Response Plan to the MMS in 2000; it was revised in June of 2009. This Response Plan addressed the entire Gulf of Mexico area, including the area drilled by the Deepwater Horizon. According to former MMS Director Elizabeth Birnbaum, each Response Plan is to be thoroughly and meticulously reviewed by MMS personnel to ensure that the company can indeed respond to a worst-case scenario oil spill.

33.     The BP's Oil Spill Response Plan submitted to MMS to support offshore drilling

permits vastly understated and concealed the dangers posed by an uncontrolled oil leak and vastly overstated BP's capability to respond to and contain a major oil spill to keep it from impacting the environment, the public and the Plaintiffs. In the greedy interest of billions of dollars in offshore drilling profits, BP chose to misrepresent its capability to respond and prevent impact to the environment, the public and the Plaintiffs and conceal its incapability to respond.

34.     Contrary to representing to MMS regulators, the public and the Plaintiffs that it was fully capable of effectively responding to a major oil spill, BP CEO Defendant Hayward recently admitted that the company was in fact not prepared to respond to the Deepwater Horizon oil spill. In an interview with *Financial Times* Defendant Hayward conceded BP was not prepared to respond to deepwater oil spills: "What is undoubtedly true is that we did not have the tools you would want in your tool kit … [it is] an entirely fair criticism …."

35.     Similarly, on May 12, 2010, BP President of BP America testified to the House of Representatives Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, that BP did not have the capability and technology to respond to the Deepwater Horizon oil spill:

> Mr. McKay.  We are using the best technology at scale. This is the
> largest effort that has ever been put together. So we believe we are
> using the best technology and if we have ay other ideas—
> Mrs. Capps.  But you never had any until it happened.
> Mr. McKay.  Well, we have been drilling with the Coast Guard for
> years.

Mrs. Capps. Did you develop technologies for dealing with this?

Mr. McKay. Not individual technologies for this, no.

Mrs. Capps. I rest my case. (Congressional Hearing Transcript, at
137).

36.      BP's 2009 so-called Oil Spill Response Plan, approved by the MMS, also

included such blatant mistakes as references to sea lions, seals and walruses (Arctic

marine mammals that clearly do not reside in Gulf waters), links to a Japanese home

shopping website as being one of BP's Marine Spill Response Corp. "primary equipment

providers for BP in the Gulf of Mexico region [for] rapid deployment of spill response

resources," instructions to BP media spokespersons to never make promises that

"property, ecology, or anything else will be restored to normal", and references to a

professor listed as a consultant for responding that died four years before in 2005. MMS

twice approved this Oil Spill Response Plan.

37.      In order to receive a permit to drill at MS Canyon Block 252 (also known as the

"Macondo Prospect" and "Deepwater Horizon" project), BP also had to submit an Initial

Exploration Plan to MMS that also incorporated the 2009 plan by reference.  BP

submitted the additional exploration plan on February 23, 2009. The explorations plan

submitted to MMS included further oil spill response capability misrepresentations and

further concealed the fact that BP was not prepared to respond to a major oil spill. The

exploration plan is entitled "Initial Exploration Plan, Mississippi Canyon Block 252,

OCS-G 32306, Public Information."

38.      In its Initial Exploration Plan for MS Canyon Block 252, BP again misrepresented

that it had "the capability to respond, to the maximum extent practicable, to a worst-case

discharge or a substantial threat of such a discharge, resulting from the activities proposed in our Exploration Plan." The worst-case scenario oil spill BP made response capability misrepresentations upon in the Plan was listed at 300,000 barrels of oil per day[1]. BP made assurances that it could respond to a blowout of this size. In order to secure the Deepwater Horizon exploration drilling permit BP concealed the fact that it was not prepared to respond to a major oil spill anywhere near that size, including the present oil spill.

39.     Although the document does not detail how a runaway well would be stopped, nor does it mention any safeguard devices, it does include a list of equipment required to set up a "Joint Information Center," including a podium, four to six telephones, an answering machine, a wall clock and various other office supplies. The MMS accepted this Initial Exploration Plan via letter on April 6, 2009. The approval was given in conjunction with a categorical exclusion from National Environmental Policy Act of 1969 (hereinafter NEPA), which would have required the agency to conduct an extensive Environmental Impact Statement (hereinafter EIS) on the potential environmental impact of the drilling.

40.     Both NEPA and MMS internal policies state that categorical EIS exclusions should not be given in instances where drilling is to take place in "relatively untested deep water," "areas of high biological sensitivity" or for drilling operations "utilizing new or unusual technology." MS Canyon Block 252 would fall into all of these categories.

41.     The ill-fated Deepwater Horizon exploration plan included additional misrepresentations that BP had the capability to respond to a major oil spill and assured

---

[1] The current, unmanageable spill is estimated to be dispersing around 25,000 to 40,000 barrels per day.

MMS, the public and the Plaintiffs that a major oil spill would have no impact to the environment, marine and coastal habitat, and beaches and coastal communities. For example, the exploration plan BP submitted to MMS, the public and the Plaintiffs misrepresented: "In the event of an unanticipated blowup resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses, implementation of BP's Regional Oil Response Plan which addresses available equipment and personnel, techniques for containment and recovery and removal of the oil spill."

42.     It is now clear that BP concealed the fact that it did not have the "proven equipment and technology" to respond to the Deepwater Horizon oil spill. In fact, a BP statement released on May 10, 2010, concedes: "All of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

43.     It is equally clear that BP CEO Defendant Hayward was fully aware of and aided and abetted the misrepresentations, material omissions and concealment associated with the BP regional response plan and the initial exploration plan submitted by BP Exploration & Production, Inc. to MMS to secure permission to drill. Aside from being BP's CEO since 2007, Defendant Hayward was CEO of BP Exploration & Production, Inc. from 2002-2007. As such, Defendant Hayward has been and is fully aware of the necessary submission of the response plans to MMS to support drilling permits and that the representations of BP's capability to respond to major deepwater oil spill were false and deceptive. Even knowing the dangers associated with BP having no capability to respond to a major oil spill on the Deepwater Horizon project, Defendant Hayward chose

the huge profits from drilling over protecting the environment, the public and the
Plaintiffs from this epic environmental and economic catastrophe.

44.     On May 17, 2010, Senator Barbara Boxer, Chairman of the Senate Committee on
Environmental and Public Works, and other committee members sent a letter to Attorney
General Eric Holder requested that he open a civil and criminal investigation of the above
false statements included in the exploration plan BP submitted to secure its exploratory
drilling permit.

45.     Attorney General Holder has since announced that the Department of Justice has
opened a criminal investigation of BP for any unlawful conduct.  President Barack
Obama also recently publicly stated that BP will be held accountable to the full extent of
the law and that it appears that BP cut safety and safeguard corners for offshore drilling at
the expense of the environment and the American people.

46.     With lease permit in hand, BP began drilling on MS Canyon Block 252 on
February 15, 2010.

47.     Capable of drilling at over 35,000 feet, BP had obtained an MMS permit for
20,211 feet for this particular location.  A crewman on the Deepwater Horizon who
handled BP company records claimed that the rig had actually been drilling over permit
limitations at around 22,000 feet.

48.     On April 20th, 2010, the Deepwater Horizon was in the final phases of drilling the
exploratory well when the blowout and following major deepwater spill occurred.  In the
more than 50 days since the oil spill BP repeatedly tried untested technology to stop the
massive uncontrolled oil spill without success.

49.     BP has also continued to misrepresent the rate at which the thousands of barrels

per day that are leaking from the uncontrolled and uncontained oil spill. BP has repeatedly low-balled its estimates to avoid the huge royalty payments and further massive oil spill rate support for damages liability BP has incurred from the oil spill. Although BP began with spill rate misrepresentations of 1,000 barrels per day, there is a wide consensus that the leakage is a minimum of 25,000 to 40,000 barrels per day and potentially far higher.

### C. The Oil Industry's Scheme To Infiltrate MMS With A Culture Of Corruption

50.     Since 2000, the relationship between oil companies and the MMS agency that regulates their offshore oil drilling has been characterized as a incestuous revolving door.

51.     MMS ethics rules prohibit personnel from soliciting or accepting gifts from "a prohibited source"— defined as a company that "has an interest which may be affected by the employee's official duties." Reports from the Inspector General reveal that oil industry representatives "purchased meals, drinks, and other items of entertainment" for MMS employees and felt that the government agents were "partners" or "customers."

52.     The MMS employees were instructed to keep quiet about attending the oil industry social events and trips and one MMS supervisor even requested that employees RSVP to an industry event "in private."

53.     The OIG investigative reports have found incidents in which the oil industry has wooed MMS agents with an unlawful and unethical cascade of gifts, drugs, sex and alcohol. Specifically, one document concluded that government personnel "frequently consumed alcohol at industry functions, had used cocaine and marijuana, and had sexual relations with oil and gas company representatives."

54.     The various gifts bestowed on MMS figures included: golf and ski trips,

snowboarding rental and lessons, golf and garment bags, silver trays, tickets to sporting events and music concerts, meals & drinks, invitations to holiday parties in various locations, "treasure hunt tours" in the Arizona desert, hunting and fishing trips and paintball outings. One employee continued to conduct safety inspections on a company he was currently in negotiations with for employment.

55.     In October of 2008, Donald C. Howard, a Gulf of Mexico MMS official, pled guilty to making false statements. Howard had accepted gifts from an unnamed oil company that conducted business in his jurisdiction and had not reported it on his financial disclosure statement.

56.     From these reports, it is clear that the relationships the oil companies were cultivating with the MMS were to deprive the public of the honest services of the agency charged with providing environmental and public safeguards associated with offshore drilling. They succeeded.

57.     BP itself has also successfully infiltrated the MMS; it has systematically submitted unsubstantiated and erroneous Exploration and Oil Spill Response Plans and Lease Agreements, and it has been allowed to veto MMS efforts to implement additional safety rules and regulations that would have cost BP money to carry out. If it appeared that an oil lease would have been prevented for failure to procure a National Oceanic and Atmospheric Administration endangered species permit, MMS would simply bypass the requirement. If a lease should have been declined due to MMS's own scientists' reports showing the possibility of a significant environmental impact, the agency would downgrade those findings of spill risks, or, in some cases, have those findings changed completely to indicate no environmental impact at all.

58.     This problem has been systemic within the agency with certain MMS government employees. In a September 2009 letter from NOAA to MMS, NOAA accused MMS of a pattern of understating the likelihood and potential consequences of a major oil spill. The NOAA letter claims that MMS emphasizes the safety of offshore drilling while ignoring more recent evidence to the contrary. The letter asserts that the data used to justify approval of drilling in the gulf understates the "risks and impacts of accidental spills."

59.     Similarly, MMS scientists have been quoted as stating: "You simply are not allowed to conclude that the drilling will have an impact …. If you find the risks of a spill are high or you conclude that a certain species will be affected, your report gets disappeared in a desk drawer and they find another scientist to redo it or they rewrite it for you."

60.     Certain MMS government employees have been more interested in accommodating the oil companies rather than providing the American citizens honest services in their oversight responsibilities to the environment and the public. They have systematically failed to act upon safety information, instead looking out for the monetary interests of oil companies, including BP.

61.     Equally troubling is the recent statement by Bobby Maxwell, a former MMS auditor who spent 22 years with the Interior Department. Mr. Maxwell stated that he has witnessed MMS so-called "inspections" of oil rig safety that were actually faked. Mr. Maxwell told CNN "They would look at some papers, have lunch, shake hands with their friends and say goodbye." He said MMS had a "culture of corruption" and that no real inspections were actually conducted.

62.     The MMS has known at least since 2000 that a deepwater oil spill like the

17

Deepwater Horizon spill could be a catastrophe. For example, while noting a blowout was unlikely, a Shell oil company offshore drilling plan filed with MMS prophetically stated: "Regaining well control in deep water may be a problem since it could require the operator to cap and control well flow at the seabed in greater water depths ... and could require simultaneously firefighting efforts at the surface." The 2000 Shell oil company plan warned that an oil spill in deep water would not be the same as in shallow water. "Spills in deep water may be larger due to the high production rates associated with deepwater wells and the length of time it could take to stop the source of pollution."

63.    In 2004, the MMS commissioned a study on "shear ram" blowout preventers and their efficacy in deepwater pressures. This study found that

> failure to shear when executing this final option would be expected to result in a major safety and/or environmental event. Improved strength in drill pipe, combined with larger and heavier sizes resulting from deeper drilling, adversely affects the ability of a given ram BOP to successfully shear and seal the pipe in use . . . only three recent new-build rigs out of fourteen were found able to shear pipe at their maximum rated water depths . . . this grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a blowout.

Even after receiving these results, no additional safety measures were put into place by MMS other than the existing regulatory regime that included permitting and submission of regional and exploratory plans and response capability assurances.

64.    Likewise, between 2005 and 2009, the rate of drill site inspections dropped by nearly 40%; even though, the number of drill rigs rapidly increased during this time period. Penalties issued by MMS for regulatory violations dropped from 66 in 2000 to 20

last year.

65.     BP used its influence over the MMS in 2009 to quash an effort by the agency to require operators to "develop and implement a Safety and Environmental Management System" that, based upon numerous accident panel investigative reports, would have "reduced the risk and number of accidents, injuries and spills during Outer Continental Shelf activities." Faced with opposition from the oil companies, the MMS proposed regulations were never implemented.

66.     Even though it was well aware of the dangers of deep water drilling, Defendant BP alone spent over $16 million dollars lobbying the Federal government for less restricted drilling on the continental shelf.

67.     The outright manipulation and apparent control MMS had over certain MMS government employees by BP and its scheme to diminish the safeguards this agency is charged with administering has apparently been intended to deprive the American citizens of these government employees' duty of honest services.

68.     Plaintiffs reserve the right to amend this complaint to include honest services mail and wire fraud RICO predicate acts, conspiracy to commit honest services mail and wire fraud, additional RICO violations, and additional defendants after further investigation and discovery.

**D. Related RICO Fraudulent Predicate Acts: Business As Usual**

69.     There is no doubt that BP's practice of fraud and deceit is "business as usual" for the oil company. Indeed, BP is working even today through MMS to avoid safety regulations and stifle inquiry into its preparation practices.

70.     In October of 2007, BP's Atlantis Platform began production in the Gulf. This rig

is the world's deepest semi-submersible oil and gas platform, currently operating at a water depth of over 7,000 feet. According to BP's chief executive of exploration and production Andy Inglis "the water depths and reservoir structure make Atlantis among the most technologically challenging developments undertaken by BP."

71.     Nearly two years ago, on August 15, 2008, internal BP emails noted that ". . . [c]urrently there are hundreds if not thousands of subsea documents that have never been finalized" and these omissions could "cause a catastrophic Operator's error."

72.     On March 4, 2009, whistleblower Ken Abbott notified BP of the missing documents and safety issues. He then notified the MMS of the deficiency that same month. MMS did nothing.

73.     Two months later, an independent engineer named Mike Sawyer completed an evaluation of BP's database and concluded that BP's failure to maintain the proper documents could lead to catastrophic hazards and recommended that the platform be temporarily shut down until the issues are resolved.

74.     On June 30, 2009, MMS and BP engaged in discussion over the matter, and the agency requested documents for review. Almost a month later, the MMS received documents from BP that were completely unrelated to the whistleblower's concerns. Again, the MMS did nothing.

75.     On October 30, 2009, following a request by the Food and Watch Watch group, the MMS responded in a letter that "MMS does not agree with your assessment of the potential for imminent danger to individuals or the environment, for which you premise your argument. After a thorough review of these allegations, the MMS, with concurrence of the Solicitor's Office, concludes your claims are not supported by the facts or the law."

MMS further stated that although some of its regulatory requirements governing offshore oil and gas operations do require "as built" drawings, they do not have to be complete or accurate and are irrelevant to the hazard analysis that BP is required to complete.

76.     On January 15, 2010, BP sent a letter to members of Congress, denying any and all problems with the Atlantis platform, and alleging that it had only recently become aware of the whistleblower's complaints. As noted above, BP internals emails revealed that it was actually aware of the issue nearly a year and a half earlier.

77.     On April 30, 2010, MMS contacted Food and Water Watch, along with the whistleblower, announcing that it had not and would not be investigating the Atlantis platform matter.

## E.  General Impact And Direct Injury From Defendants' Unlawful Conduct And Resulting Oil Spill

78.     Contrary to BP's representations to MMS and the public in the Mississippi Canyon permitting process that a much larger oil spill would not even have an impact due to BP's equipment and capability of responding to oil spills, the uncontrolled and uncontained oil spill has and continues to have a direct devastating impact on the environment and the economic well-being of the Plaintiffs and other injured parties.

79.     After BP's initial attempts to conceal the catastrophic nature of the uncontrolled and uncontained oil spill by vastly underestimating the amount of oil spewing from its crippled well and refusing to release sub sea video of the gusher, rough estimates of the total amount of uncontrolled spilling varied. The government now estimates that between 25,000 to 40,000 barrels per day.

80.     Florida's 1,350 miles of coastline is home to 12 million coastal residents, which constitutes 75% of Florida's population. The coastal counties of Florida created 78% of

the State's economic output, 77% of the State's jobs and 79% of the State's income. In addition to full time residents, Florida's beaches and coastal areas serve as the backbone of the State's $65.5 billion tourism industry. Prior to the spill, Florida's Gulf coast counties produced 269,000 jobs and $12.4 billion in spending per year. It is difficult to estimate the full extent of the impact this oil spill will have on the Gulf and those whose livelihoods and way of life depend on it. However, research conducted by the University of Central Florida shows that the spill could end up costing Florida 195,000 jobs and $10.9 billion in spending if the 23 Gulf Coast counties lose half their tourism and leisure jobs. Even if the affected counties lose 10% of their tourism and leisure jobs and related spending, Florida will still lose 39,000 jobs and $2.2 billion.

81.    Plaintiffs coastal condo owners Class have also suffered enormous direct financial injury[2] as a direct consequence the Defendants' unlawful conduct resulting in the oil spill. These direct RICO injuries include but are not limited to the fact that the Plaintiffs have actually realized diminished property values directly caused by the oil spill brought on by the Defendants' unlawful RICO violations, and the diminished value has tangibly manifested itself. Plaintiffs injuries are concrete, tangible injuries directly caused by the oil spill and Plaintiffs' unlawful conduct; Plaintiffs injuries are not speculative or contingent.

82.    As alleged above, BP's own shareholders even acknowledge that BP's oil spill and BP's associated unlawful conduct subjects BP to liability for the direct injury it has caused Plaintiffs and others. "The liability of the various defendants herein is clear .... these defendants continued to ignore safety issues concerning the Company's deepwater

---

[2] According to *Bloomberg Businessweek*, the uncontained oil could cost coastal property owners $43 billion in real estate values.

operations, making purely cosmetic changes at the corporate level while ignoring the

substance of the safety violations and the threat they posed to the entirety of the Gulf,

*commercial and private property*, and the Company's own survival as a going concern."

(emphasis added).

## CLASS ACTION ALLEGATIONS

83.    Plaintiffs bring this action on behalf of themselves and all others similarly

situated, as members of the proposed Plaintiffs' class. The proposed class is initially

defined as:

> All persons, firms, or entities who currently own, or who
> on or after April 20, 2010, have owned condominium units
> within a condominium complex or development abutting
> the Gulf of Mexico or situated up to one half (1/2) mile
> inland from the Gulf of Mexico in the counties of
> Escambia, Santa Rosa, Okaloosa, Walton, and Bay in the
> Florida panhandle which have been impacted by the BP oil
> spill.
> Excluded from the class are (1) the Defendants in this
> action (and their respective officers, directors, and
> employees), and any entity in which the Defendants have a
> controlling interest, and the legal representatives, heirs,
> successors, and assigns of the Defendants; and (2) any
> governmental entity, subdivision, agency or department.

84.    Numerosity—Fed. R. Civ. P. 23(a)(1): Upon information and belief, the Class

consists of hundreds of thousands of individuals and/or businesses who have been legally

injured by the disaster, making joinder impracticable. The disposition of the claims

asserted herein through this class action will be more efficient and will benefit the parties

and the Court.

85.    Typicality—Fed. R. Civ. P. 23(a)(3): Plaintiffs claims are typical of the claims of

the proposed class in that the representative Plaintiffs, like all Class Members, have

suffered adverse effects due to the Defendants wrongful conduct. The claims of the

Plaintiffs and all proposed class members are based upon the same legal theories.

86.     Adequacy—Fed. R. Civ. P. 23(a)(4): Plaintiffs are adequate representative of the

proposed class because their interests do not conflict with the interests of the members of

the class they seek to represent. Plaintiffs adequately and truly represent the interests of

the absent class members; they have retained counsel with substantial experience in

complex environmental class action litigation and Plaintiffs, along with their counsel,

have the financial resources to pursue this action vigorously. The interests of Plaintiffs

are coextensive with the interests of the proposed class members, with common rights of

recovery based upon the same essential facts.

87.     Existence and Predominance of Common Questions of Fact and Law—Fed. R.

Civ. P. 23(a)(2): Common questions of fact and law predominate over the questions

affecting only individual class members. These common factual questions and legal

inquiries include, but are not limited to:

> a.  Whether Defendants were engaged in a scheme to fraudulently acquire oil drilling permits;
> b.  Whether and to what extent the Defendants have caused concrete, tangible economic damages to be realized by the Plaintiffs;
> c.  Whether Defendants were corruptly using the MMS in their fraudulent scheme;
> d.  Whether Defendants fraudulently misrepresented they could contain a major oil spill and fraudulently concealed the fact that did not have the equipment and technology to contain a major oil spill;
> e.  Whether Defendants engaged in acts of mail and or wire fraud in direct violation of the Federal or Florida RICO statute;
> f.  Whether and to what extent the conduct has caused injury to the Plaintiff and the Plaintiff's class;
> g.  Whether the Defendants have engaged in a pattern of unlawful conduct;
> h.  Whether the Defendants have conducted or participated, directly or indirectly, in a pattern of unlawful conduct in the operation, management or conduct of an enterprise in violation of 18 U.S.C. § 1962(c);
> i.  Whether Plaintiffs and the proposed class members were injured as a

result of Defendants' acts or omissions, and, if so, the appropriate
class-wide measure of damages.

88.     This action has been brought and may be properly maintained pursuant to the

provisions of Fed. R. Civ. P. 23(b)(1) and 23(b)(3) and the case law thereunder.

89.     Superiority—Class action treatment is a superior method for the fair and efficient

adjudication of the controversy in that, among other things, there is no interest by

members of the class in individually controlling the prosecution of separate actions.

Additionally, without a class action, individual class members would face burdensome

litigation expenses, deterring them from bringing suits that would adequately protect their

rights.  Whatever difficulties may exist in the management of the class action are greatly

outweighed by the class action procedure that would provide claimants with a method for

the redress of claims that may not otherwise warrant individual litigation. The

prosecution of individual claims by members of the class would create the risk that

adjudication concerning individual members may substantially impede the ability of other

members to protect their interests.

## COUNT I :    BY PLAINTIFFS AGAINST DEFENDANTS FOR
## VIOLATION OF 18 U.S.C. 1962(c)

90.     Plaintiffs reallege and incorporate by reference paragraphs 23 through 82 above.

91.     The Racketeering Influenced and Corrupt Organizations Act ("RICO") provides:

> It shall be unlawful for any persons employed by or
> assocated with any enterprise engaged in, or the activities
> of which affect, interstate or foreign commerce, to conduct
> or participate, directly or indirectly, in the conduct of such
> enterprise's affairs through a pattern of racketeering
> activity or collection of unlawful debt.  18 U.S.C.
> § 1962(c).

92.     Defendant BP, is and was at all times relevant to this action, a RICO "person"

25

within the meaning of 18 U.S.C. § 1961(3).

93.     The Minerals Management Services Enterprise (hereinafter "The MMS Enterprise") is an "enterprise" within the meaning of § 1961(4) of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 to 1968. The Minerals Management Services is a federal regulatory agency that at all relative times possessed and continues to possess an ongoing organizational structure separate and apart from all racketeering activity.

94.     At all relevant times MMS' activities have affected and continue to affect interstate and foreign commerce and existed separate and apart from the racketeering activity. For example, MMS is responsible for the nationwide management of natural gas, oil and other mineral resources on the outer continental shelf. In addition, the MMS collects, accounts for and disburses an average of $13.7 billion dollars a year in revenues from federal offshore mineral leases on federal and American Indian lands.

95.     Throughout the period relevant to this action, BP was an oil company fraudulently acquiring lease agreements of federal properties and drilling permits for the purpose of producing oil, and conducted and participated in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

**Predicate Acts of Racketeering**

96.     As set forth in greater detail above in paragraph 23-82, BP and its competitors engaged in a fraudulent scheme to maximize profits at the expense of the environment and U.S. citizens by submitting fraudulent permit response plans and by corrupting and manipulating the regulatory body charged with overseeing safeguards for drilling operations. BP did this by courting and corrupting MMS employees and sending them

26

woefully incomplete or inaccurate documents that they would then rubber stamp without the slightest review.

97.     For the purpose of devising and carrying out their scheme and artifice to defraud Plaintiffs and MMS by means of false and fraudulent pretenses, representations and promises, the Defendants did place in an authorized depository for mail, or did deposit or cause to be deposited with private and commercial interstate carriers and knowingly caused to be delivered by the United States postal service, letters, memoranda, and other matters, in violation of 18 U.S.C. § 1341, as follows, or aided and abetted the following criminal acts:

       a.  A mailing dated February 23, 2009, titled "Initial Exploration Plan Mississippi Canyon Block 252", which was submitted to the Minerals Management Service. In this document, BP minimized the prospect of any serious damage associated with a spill, saying there would be only "sub-lethal" effects on fish and marine mammals, and "birds could become oiled." BP further represented that "[i]n the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using *proven equipment and technology* for such responses, implementation of BP's Regional Oil Spill Response Plan which address available equipment and personnel, techniques for containment and recovery and removal of the oil spill." [emphasis added]

       b.  A letter dated April 6, 2009, sent by the MMS to Scherie Douglas at BP, approving BP's Initial Exploration Plan of Mississippi Canyon Block 252. This mailing attached and mailed a copy of BP's submitted plan.

       c.  A letter dated September 14, 2009, sent from BP to the MMS. In this letter, BP fought off safety regulations, which would have required them to have their safety program audited at least once every three years, instead of the voluntary system that is currently in place. Specifically, BP stated "[w]hile BP is supportive of companies having a system in place to reduce risks, accidents, injuries and spills, we are not supportive of the extensive, prescriptive regulations as proposed in this rule. We believe the industries current safety and environmental statistics demonstrate

that the voluntary programs implemented since the adoption of
API RP 75 have been and continue to be very successful.

d.  BP caused an Environmental Impact Statement, dated October 22,
2007, to be signed by the Director of MMS, Randal B. Luthi. The
EIS never once analyzes the impact of a major oil spill, like the
Deepwater Horizon, but rather downplays the efforts needed to
control any accident caused from drilling operations.

e.  On October 30, 2009, a letter from MMS to Food and Water
Watch, in response to the organization's freedom of information
act request seeking documents that indicate BP "has in its
possession a complete and accurate set of 'as built' drawings . . .
for its entire Atlantis project, including the subsea sector." In this
response, MMS denied the request, stating that "MMS does not
agree with your assessment of the potential for imminent danger to
individuals or the environment . . ." MMS further states that
although some of its regulatory requirements governing offshore
oil and gas operations do require "as built" drawings, they need not
be complete or accurate.

98.    For the purpose of devising and carrying out their schemes and artifice to defraud

Plaintiffs by means of false and fraudulent pretenses, representations and promises, the

Defendants caused to be transmitted by means of wire communication in interstate

commerce, writings, signals and sounds, to wit, interstate electronic mail messages and/or

faccimile in violation of 18 U.S.C. § 1343, as follows:

a.  An August 15, 2008 email sent by Barry Duff, BP Production
Member, to BP officials, warning the officials that the Piping and
Instrument Diagrams for the Atlantis subsea components "are not
complete" and "there are hundreds if not thousands of subsea
documents that have never been finalized, yet the facilities have
been" up and running. These documents form the foundation of a
hazards analysis BP is required to undertake as part of its Safety
and Environmental Management Program related to its offshore
drilling operations. The email further states [t]he risk in turning
over drawings that are not complete are: 1) The Operator will
assume the drawings are accurate and up to date, . . .

99.    There are numerous additional mail and wire fraud predicate acts, including the

following fraudulent communications that were sent by either the mails or the wires or both, to wit:

        a. A BP Regional Oil Spill Response Plan with an original issue date of December 1, 2000 and a revision date of June 30, 2009 that was submitted to the MMS. In this plan, BP gives a false impression of its capabilities to handle a worst case oil spill by grossly underestimating the potential impact of a deepwater oil spill. BP states that in the event of an oil spill at a facility that is more than ten miles off the coast, the worst case discharge would be 177,400 barrels for the entire spill. Current reports suggest that the Deepwater Horizon oil spill is leaking between 25,000 and 40,000 barrels of oil per day, 750,000 to 1,200,000 barrels per month. One month has already passed and it is possible, if not likely, that the spill will continue at this rate for several more months. While BP was responsible for submitting a researched and accurate Oil Spill Response Plan, this was simply not the case. Indeed, the plan mentions such marine mammals as "Sea Lions, Seals, Sea Otters" and "Walruses" as "Sensitive Biological Resources" even though none of these animals are present in the Gulf of Mexico. This implies that much of the Response Plan was simply cut and pasted from prior Arctic exploratory planning. To add insult to injury, the Response Plan lists a website for a Japanese home shopping site as the link to one of its "primary equipment providers for BP in the Gulf of Mexico Region rapid deployment of spill response resources on a 24 hour, seven days a week basis."

        b. An April 15, 2010 wire communication from BP to MMS, requesting a permit to modify its plan to deal with a blockage. In the document, BP apologizes to government personnel for not having mentioned the type of casing they were using earlier, adding that they had "inadvertently" failed to include it. Less than ten minutes after submitting the request, the MMS approved the permit. Earlier that same month, BP internal documents had noted that the casing was "unlikely to be a successful cement job" and that the plan for casing the well was "unable to fulfill M.M.S. regulations."

        c. An email from BP spokesman David Nicholas stating that BP's Oil Spill Response Plan was an "integral part of our permitting with the MMS" and contending that "it is this plan that has been in action in response."

100.    Defendant Hayward has aided and abetted BP in committing RICO violations.

Hayward was the CEO of BP Exploration and Production, Inc. from 2002-2007 and has been serving as BP's current CEO since 2007. As such, he has been and is fully aware of the submission of the documents to MMS and the misrepresentations of BP's capability to respond to a major deepwater oil spill. Additionally, Hayward has attempted to conceal the gravity of BP's misdeeds by lying about the daily amount of oil being spewed into the Gulf, the existence of plumes under water and the effect that the spewing oil would have on the Gulf environment.

101.    The Defendant's predicate acts constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) because the predicate acts are related and continuous. Each predicate act had the same or similar purpose and result (to use the MMS to fraudulently acquire oil drilling permits and thus deprive the public of the protections offered by the regulatory agency).

102.    Continuity is demonstrated by the predicate acts alleged above, along with the related predicate acts described below. These predicates illustrate a threat of continued racketeering activity and evince that the predicates constitute the regular manner that BP conducts business.

### Related Predicate Acts

103.    BP's pattern of committing predicate acts satisfies the continuity requirement of civil RICO, as demonstrated both by the alleged predicate acts, along with other related predicates such as:

> a.  A mailing sent from BP to MMS, dated March 23, 2010, with their Initial Exploration Plan for the Green Canyon area attached. In this Initial Exploration Plan, BP represents that they have the capability to respond to a worse case discharge from an uncontrolled blowout—emitting 250,000 barrels of oil per day into the Gulf of Mexico. Under the heading "blowout scenario," BP's

30

Plan states that the information is "not required." The plan concludes that "no alternatives to the proposed activities were considered to reduce environmental impacts" and further states that "no mitigation measures other than those required by regulation will be employed to avoid, diminish or eliminate potential impacts on environmental resources."

b. On May 6, 2010, the MMS published on the internet its approval of the BP Exploration Plan for the Green Canyon Area. Even as the Deepwater Horizon site continues to spew fatal amounts into the Gulf of Mexico (contrary to BP's prior assurances that it could handle much larger spills), this approval for Green Canyon was made with a categorical exclusion—meaning no Environmental Impact Statement was prepared or analyzed by the MMS. This is in direct conflict with the agency's own internal policy that exclusions not be given in instances where the drilling was to be in deep water and/or using new technology.

104.   Plaintiffs are and continue to be injured in their business or property by reason of

the predicate acts of racketeering and resulting RICO violations.

**COUNT II:   BY PLAINTIFFS AGAINST DEFENDANTS FOR VIOLATION OF 18 U.S.C. 1962(d) THROUGH VIOLATION OF 18 U.S.C. § 1962(c)**

105.   Plaintiffs re-allege and incorporate by reference paragraphs 23 through 82 above.

106.   18 U.S.C. § 1962(d) provides:

It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

107.   The conspiracy between Defendant BP and MMS personnel John Doe[s] revolves

around NEPA and the required Environmental Impact Statements. Several former and

current MMS scientists (who have chosen to remain anonymous for fear of reprisal), have

stated that any findings of an environmental impact are routinely changed and/or

modified by MMS managers in order to secure permits for the oil companies. This

scientific tampering constitutes clear circumstantial evidence that MMS employees were

engaged in a conspiracy with oil companies such as BP to violate civil RICO in the

manner expounded upon above.

## COUNT III: BY PLAINTIFFS AGAINST DEFENDANTS FOR
## VIOLATION OF FLA. STAT. ANN. § 772.103(3)

108.    Plaintiffs re-allege and incorporate by reference paragraphs 23 through 82 above.

109.    FLA. STAT. ANN. § 772.103(3) provides

> It is unlawful for any person . . . employed by, or associated
> with, any enterprise to conduct or participate, directly or
> indirectly in such enterprise through a pattern of criminal
> activity or the collection of an unlawful debt.

110.    Defendant BP, is and was at all times relevant to this action, a RICO "person"

within the meaning of FLA. STAT. ANN. § 772.103.

111.    The Minerals Management Services Enterprise (hereinafter "The MMS

Enterprise") is an "enterprise" within the meaning of FLA. STAT. ANN. § 772.102(3). The

Minerals Management Services is a federal regulatory agency that at all relative times

possessed and continues to possess an ongoing organizational structure separate and apart

from all racketeering activity.

112.    At all relevant times MMS' activities have affected and continue to affect

interstate and foreign commerce and existed separate and apart from the racketeering

activity. For example, MMS is responsible for the nationwide management of natural

gas, oil and other mineral resources on the outer continental shelf. In addition, the MMS

collects, accounts for and disburses an average of $13.7 billion dollars a year in revenues

from federal offshore mineral leases on federal and American Indian lands.

113.    Throughout the period relevant to this action, BP was an oil company fraudulently

acquiring lease agreements of federal properties for the purpose of producing oil, and

conducted and participated in a pattern of racketeering activity in violation of FLA. STAT. ANN. § 772.103(3).

### Predicate Acts of Racketeering

114. Plaintiffs incorporate and re-allege the predicates and related predicates set forth in paragraphs 96 through 103 of this Complaint.

115. The Defendants predicate acts constitute a pattern of racketeering activity within the meaning of FLA. STAT. ANN. § 772.102(4) because the predicate acts are related and continuous. Each predicate act had the same or similar purpose and result (to use the MMS to fraudulently acquire oil drilling permits and thus deprive the public of the protections offered by the regulatory agency).

116. Continuity is demonstrated by the predicates and related predicates alleged above. These predicates illustrate a threat of continued racketeering activity and show that the predicates constitute the regular manner in which BP conducts business.

117. Plaintiffs are and continue to be injured in their business or property by reason of the Defendants commission of predicates acts of racketeering and subsequent RICO violations.

118. As such, Plaintiffs have been injured in their business and/or property by reason of BP's violation of FLA. STAT. ANN. § 772.103(3) and are entitled to recover threefold the damages they have sustained and the cost of this suit, including a reasonable attorneys fee.

### COUNT IV: BY PLAINTIFFS AGAINST DEFENDANTS FOR VIOLATION OF FLA. STAT. ANN. § 772.103(4)

119. Plaintiffs reallege and incorporate by reference the allegations of Count III.

120. FLA. STAT. ANN. § 772.103(4) provides that it shall be unlawful to conspire to

violate FLA. STAT. ANN. § 772.103(3).

121.    Defendant BP, is and was at all times relevant to this action, a RICO "person" within the meaning of FLA. STAT. ANN. § 772.103.

122.    The Minerals Management Services Enterprise (hereinafter "The MMS Enterprise") is an "enterprise" within the meaning of FLA. STAT. ANN. § 772.102(3).  The Minerals Management Services is a federal regulatory agency that at all relative times possessed and continues to possess an ongoing organizational structure separate and apart from all racketeering activity.

123.    At all relevant times MMS' activities have affected and continue to affect interstate and foreign commerce and existed separate and apart from the racketeering activity.  For example, MMS is responsible for the nationwide management of natural gas, oil and other mineral resources on the outer continental shelf.  In addition, the MMS collects, accounts for and disburses an average of $13.7 billion dollars a year in revenues from federal offshore mineral leases on federal and American Indian lands.

124.    Throughout the period relevant to this action, BP was an oil company fraudulently acquiring lease agreements of federal properties for the purpose of producing oil, and conducted and participated in a pattern of racketeering activity in violation of FLA. STAT. ANN. § 772.103(3).

## Predicate Acts of Racketeering

125.    Plaintiffs incorporate and re-allege the predicates and related predicates set forth in paragraphs 96 through 103 of this Complaint.

126.    The Defendants predicate acts constitute a pattern of racketeering activity within the meaning of FLA. STAT. ANN. § 772.102(4) because the predicate acts are related and

continuous. Each predicate act had the same or similar purpose and result (to use the
MMS to fraudulently acquire oil drilling permits and thus deprive the public of the
protections offered by the regulatory agency).

127.    Continuity is demonstrated by the predicates and related predicates alleged above.
These predicates illustrate a threat of continued racketeering activity and show that the
predicates constitute the regular manner in which BP conducts business.

128.    Plaintiffs are and continue to be injured in their business or property by reason of
the Defendants commission of predicates acts of racketeering and subsequent RICO
violations.

129.    Defendant BP conspired with John Does 1-100 to violate FLA. STAT. ANN. §
772.103(3) in violation of FLA. STAT. ANN. § 772.103(4).

130.    As such, Plaintiffs have been injured in their business and/or property by reason
of BP's violation of FLA. STAT. ANN. § 772.103(4) and are entitled to recover threefold
the damages they have sustained and the cost of this suit, including a reasonable attorneys
fee.

## PRAYOR FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, and for the wrongs cited factually and
legally in this Complaint and for claims presented in Counts I--III, judgment should be
rendered in Plaintiffs' favor against the Defendants, as follows:

> a.   Actual damages, equal to the dimunition of value of Plaintiffs' properties
>       due to Defendants wrongful conduct alleged herein;
>
> b.   Punitive damages;
>
> c.   Attorneys fees and expenses;
>
> d.   Treble damages.

e.   Pre-judgment interest on all awards;

f.   post-judgment on all awards;

g.   costs of this litigation; and

h.   all relief, legal or equitable, in any form to which Plaintiffs may be
     entitled.

Plaintiffs demand a trial by jury on all issues so triable.

This the 12th day of June, 2010.

**RESPECTFULLY SUBMITTED BY:**

/s/ Amanda R. Slevinski
Amanda R. Slevinski (FL Bar No.: 0027041)
Brian H. Barr (FL Bar No.: 0493041)
J. Michael Papantonio (FL Bar No.:335924)
Neil E. McWilliams, Jr. (FL Bar No.: 0016174)
**Levin, Papantonio, Thomas, Mitchell, Echsner,
Rafferty & Proctor, P.A.**
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502
(850) 435-7074
(850) 436-6034 (fax)

and

Hiram C. Eastland, Jr. (MS Bar No 5294)
Jacob K. Eastland (MS Bar No 102184)
**Eastland Law Offices, pllc.**
307 Cotton Street
Greenwood, MS 38930
(662) 453-1227
(601) 510-9697 (fax)